IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


TERRY SMITH,                          )

              Plaintiff               )

       v.                             )          No.  3:04-cv-128

BAYER CORPORATION LONG                )
TERM DISABILITY PLAN and
BAYER CORPORATION,                    )

              Defendants              )


**MEMORANDUM OPINION**


        Plaintiff Terry Smith (Smith) filed this action pursuant to the Employee

Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.*, to recover long-

term disability (LTD) income and other benefits from defendant Bayer Corporation

Long Term Disability Plan (the Plan) [*see* Doc. 1].[1]  Defendant Bayer Corporation

(Bayer) was Smith's employer for fourteen years until January 10, 2003.  Bayer is

also the plan sponsor and plan administrator, which is the designated fiduciary of the

_____

        [1]While the named defendant is "Bayer Corporation Long Term Disability Plan," the
name of the Plan is actually "Bayer Corporation Disability Plan."  [*See* Administrative
Record, p. 051 (hereinafter AR ___)].  Additionally, to avoid confusion, the page number
following the "AR" designation will refer only to the three digit number entered under the
caption "BAYER/TERRY SMITH" at the bottom of each page of the Administrative Record.

Plan [AR 053].[2]   In his complaint, Smith contends that the plan administrator wrongfully denied him LTD benefits under the Plan even though Smith was suffering from a number of psychiatric impairments [*see* Doc. 1].[3]   In their answer, defendants contend that coverage was properly denied under the Plan [*see* Doc. 5].

---

[2]Beginning in January 2004, the plan administrator was changed to Bayer Corporate and Business Services LLC, an affiliated company [*see* Doc. 22, Ex. A, ¶ 1].  At that time, the third-party claims administrator was Natalsco, Inc., d/b/a Kemper National Services, Inc. (Kemper) [*see id.*, ¶ 7;  *see also* AR 105].

[3]Smith named the "Bayer Corporation Long Term Disability Plan" as a defendant, which would certainly suggest that any claim is for LTD benefits only [*see* Doc. 1, p.1].  The first paragraph of the complaint reinforces that notion:

> COMES NOW, Plaintiff, TERRY SMITH, and makes the following representations to the Court for the purpose of obtaining relief from Defendants' refusal to pay Long-Term Disability benefits under an employee benefits plan, and for Defendant's [sic] other violations of the Employee Retirement Security Act of 1974 ("ERISA").

[*Id.*].  Moreover, Smith's complaint lists only one cause of action, *i.e.*, "FIRST CAUSE OF ACTION," in which he alleges that "Defendants agreed to provide Plaintiff with long-term disability benefits in the event that Plaintiff became disabled as defined by the PLAN." [*Id.*, p.3].  Finally, in his prayer for relief, Smith requests that the court enter an order "requiring Defendant Employer to provide Plaintiff with any other employment benefits to which she [sic] would be entitled pursuant to the finding that she [sic] is disabled under the LTD PLAN ... ." [*Id.*, p.5].  Thus, a fair reading of the complaint makes only a claim for LTD benefits and no claim for short-term disability (STD) benefits.  In fact, the first mention in this record of any claim for STD benefits was on January 18, 2005, when plaintiff's counsel sent a letter to the Bayer Corporation Benefits Administration indicating that Smith was appealing the denial of both STD and LTD benefits [AR 161-62].  However, in spite of the fact that this action has been pending for more than two years, Smith has filed no motion to amend the complaint.  In the court's view, there is no claim for STD benefits which meets the requirements of Fed. R. Civ. P. 8(a), *i.e.*, "a short and plain statement of the claim showing that the pleader is entitled to relief ... ."  Consequently, the court will consider only Smith's stated claim for LTD benefits.

This matter is presently before the court on the following motions:

    (1)      Defendants' motion for judgment on the ERISA administrative record [Doc. 22];  and

    (2)      Plaintiff's motion for judgment on the record [*see* Doc. 24].

The issues raised have been exceptionally well briefed by the parties [*see* Docs. 23, 25, 26, and 27], and excellent oral arguments were heard on March 22, 2006 [*see* Doc. 28].  Thus, this matter is now ripe for adjudication.  For the reasons that follow, plaintiff's motion will be granted, defendants' motion will be denied, and plaintiff will be awarded LTD benefits.

I.

*Factual Background and Procedural History*

Smith, now age 50, was employed by Bayer in Knoxville, Tennessee, as a Diabetes Sales Specialist [*see* Doc. 1, p.2], which is a field representative responsible for the sale of diabetes-related supplies.  According to Bayer's Occupational Demands Form, this position required Smith to work with very little guidance or reliance on oral or written instructions;  he was required to perform a wide range of tasks as dictated by variable demands and changing conditions;  he was required to relate sensitive information to diverse groups;  his position required

3

the ability to work with diverse groups to obtain consensus on complex issues; he was expected to independently apply abstract principles to solve complex conceptual issues; and he was required to persuade or explain complex issues in person or by phone [AR 018]. Smith successfully worked in that position until January 10, 2003, when he stopped because of his depression, panic disorder, and bi-polar disorder [AR 016, 020, and 021]. Smith then applied for short-term disability (STD) benefits by contacting Core, Inc. (Core), the claims administrator for the STD plan, on January 17, 2003 [AR 019-20].

Core denied Smith's STD claim by letter dated February 21, 2003, stating that "there are insufficient quantitative objective physical findings to correlate with your subjective complaints and diagnostics to support a functional impairment that you are unable to do the essential functions of your job." [AR 041]. Nevertheless, according to a letter dated April 14, 2003, from Bayer, Smith received STD benefits through April 2, 2003 [AR 045].[4] In that same letter, Smith was informed that his application for LTD benefits was also under review by Bayer's third-

---

[4]The parties agree that Smith's STD benefits ended on April 2, 2003 [*see* Doc. 23, p.2 and Doc. 25, p.1]. However, in the February 21st letter to Smith, Core indicated that Smith's STD benefits would cease on February 24, 2003 [AR 041]. The record is unclear as to why STD benefits were extended beyond the February 24th date. This discrepancy, of course, has no impact on Smith's claim for LTD benefits.

party administrator, Kemper [AR 045].[5]  By letter dated May 14, 2003, Kemper

denied Smith's claim for LTD benefits [AR 027-029].  Smith appealed that denial, but

the cessation of his benefits was upheld by an ERISA Review Committee which met

on January 17, 2004 [AR 001].  This case was then filed on March 18, 2004.  On

October 21, 2004, the court granted the parties' joint motion to remand this matter

to the plan administrator for reconsideration [*see* Doc. 16].  The denial of Smith's

benefits was again upheld on that remand by letter dated April 29, 2005 [AR 281-

284].  This case was subsequently reopened by agreed order filed on November 3,

2005 [*see* Doc. 18].

 

    The Plan provides LTD income and other benefits to employees who are

disabled for more than 26 weeks [AR 091].  For these LTD benefits to begin, the

participant "must be unable to perform the essential duties of [the participant's]

regular occupation."  [AR 098].  After six months of receiving LTD benefits, the

participant must be "'totally disabled'" to continue to be eligible for benefits.  [*Id.*].

Under the Plan, "'[t]otally disabled' means you are unable to work at any job for

which you are or could become qualified by education, training, or experience." [*Id.*].

---

    [5]Kemper, which is not affiliated with Bayer, provides claim services under a written
agreement [AR 123-43].  Under that agreement, no part of Kemper's compensation is
based upon or is affected by its decisions on benefits applications [*id.*;  *see also* Doc. 22,
Ex. A, ¶ 7].  Kemper is not financially responsible for claim payments to participants [AR
123].  It must also be noted at this point that the record is unclear as to exactly when Smith
first applied for LTD benefits (it is clear, however, that he had not applied by March 25,
2003 [AR 044] but that he had applied by April 14, 2003 [AR 045]).

A claimant is not disabled if his medical condition allows him to earn a wage comparable to his pre-disability earnings, in most cases 70% of the pre-disability wage [AR 099]. Under the Plan, it is the employee's burden to provide proof of entitlement for LTD benefits [AR 098].

It must be noted, too, that disability benefits are paid from a voluntary employees' beneficiary association (VEBA) trust, funded in part by periodic contributions from Bayer, which is used exclusively to pay benefits to participants under the Plan or to pay expenses associated with the Plan [*see* Doc. 22, Ex. B, ¶ 3]. Benefits are also funded in part by participants' salary reduction contributions [AR 059].

The court will now examine in more detail the facts and circumstances surrounding plaintiff's claim, as well as the medical proof in support of the parties' respective positions. As previously noted, Smith quit working at Bayer on January 10, 2003, due to depression, panic disorder, and bi-polar disorder [AR 016]. In fact, Smith's medical records indicate that he had been treated for depression-related problems for almost a year before he quit working for Bayer. More specifically, those records reflect that Dr. Francis P. LeBuffe treated Smith on seven occasions from February 11, 2002, following plaintiff's release from the hospital for in-patient

treatment of depression, through December 9, 2002 [AR 012; 265-71].[6]  At the

beginning of his[7] treatment, Dr. LeBuffe noted that Smith's sleep was "a major

problem" as he was only sleeping a couple of hours a night [AR 271].  Dr. LeBuffe

also noted that Smith's mood was "still quite depressed."  [*Id.*].  Nevertheless, Dr.

LeBuffe's assessment was that Smith was "[d]oing ok[.]"  [*Id.*].  In November 2002,

after at least four other meetings [AR 267-70], Dr. LeBuffe indicated that Smith's

concentration was reduced [AR 012].  Again, however, Dr. LeBuffe's assessment

was that Smith was "doing well[.]"  [*Id.*].


Dr. LeBuffe treated Smith two more times after he quit work on January

10, 2003 [AR 009-10].  However, by June 18, 2003, Dr. LeBuffe indicated in his

notes that Smith complained of decreased concentration as well as difficulty

completing tasks [AR 008].  For example, Smith would forget to switch car gears and

could not read a book [*id.*].  Further, these treatment notes reflect that Smith suffered

---

[6]Dr. LeBuffe's records reflect that plaintiff is sometimes referred to as "Terry Smith," "Spurgeon 'Terry' Smith," and "'Spurgeon' Terry Smith."  [AR 253-71].  The court also observes that many of Dr. LeBuffe's notes are difficult, if not impossible, to read.

[7]The court cannot ascertain from the administrative record whether Dr. LeBuffe is male or female.  The spelling of the first name indicates that Dr. LeBuffe is more likely to be male, and the court will so address him.  However, as will be seen later, Dr. Elana Mendelssohn refers to Dr. LeBuffe on multiple occasions as "she" and "her."  [AR 035].  Likewise, the court cannot determine from the administrative record whether Dr. Mendelssohn is male or female.  Because the first name, Elana, appears to be female, the court will so address her.

from, among other things, ADD (Attention Deficit Disorder)[8] [*id.*].[9]  By late June, Dr.

LeBuffe's notes indicated that Smith was still suffering from ADD [AR 007].[10]  By

early August 2003, Smith complained of mood changes, irritability, and depression

and his inability to pay attention and to concentrate was noted [AR 006].  Smith was,

however, no longer suicidal [*id.*].[11]  In September 2003, Smith reported mood swings

to Dr. LeBuffe, as well as days when he felt lethargic, anxious and depressed [AR

005].  Dr. LeBuffe diagnosed Bi-Polar Disorder II and ADD [*Id.*].


The medical records also reflect that Dr. LeBuffe completed a medical

assessment form on August 8, 2003 [AR 0013-14].  On that form, Dr. LeBuffe

assessed Smith as "poor"[12] with respect to the following general categories:  (1)

capacity to interact appropriately, communicate effectively, and engage in other

aspects of social functioning;  (2) abilities of concentration, persistence and pace;

and (3) ability to adapt to stressful circumstances in work or work-like settings where

---

[8]As the record reflects, ADD is a common acronym for Attention Deficit Disorder [AR 144].

[9]Those same treatment notes also indicate that Smith's MDE was stable;  however, the record does not indicate the source or meaning of this acronym.

[10]These notes also indicate that Smith was suffering from MDE and BPAD;  again, however, the record does not indicate the source or meaning of the acronym BPAD.

[11]Obviously, this notation indicates that Smith had been suicidal before;  nevertheless, because of the illegibility of many of Dr. LeBuffe's notes, the court cannot ascertain when Smith was first diagnosed as suicidal.

[12]"Poor" is defined as "[a]bility in this area is usually precluded."  [AR 249].

failure to adapt results in repeated episodes of deterioration or decompensation which cause patient to withdraw or to experience an exacerbation of symptoms [AR 013]. Additionally, Dr. LeBuffe rated Smith as "poor" in the following specific areas: (1) dealing with the public; (2) persisting at assigned tasks; (3) the ability to relate to supervisors and co-workers; (4) the ability to work at a consistent pace for acceptable periods of time; and (5) the ability to timely complete tasks commonly found in work settings [AR 013-14]. Dr. LeBuffe then concluded his evaluation with diagnoses of recurrent and severe major depression and panic disorder to support his assessment [AR 014].

While Smith was being evaluated by Dr. LeBuffe, Bayer hired third-party claims administrator Kemper to review Smith's file. The record reflects that Kemper ordered a peer-to-peer review, which was completed by Dr. Lawrence Burstein on May 9, 2003 [AR 030-31]. Dr. Burstein did not review any medical records at that time, but he did speak with Dr. LeBuffe and reported that Dr. LeBuffe "indicated that Mr. Smith believes that he will have a panic attack if he returns to work" and "acknowledged that Mr. Smith does not display significant symptoms and, aside from Mr. Smith's belief, there are no barriers to his returning to work." [AR 031]. Consequently, Dr. Burstein concluded that there was no reason that plaintiff was "unable to perform the core elements of his occupation from a psychological

perspective." [*Id.*]. On the basis of Dr. Burstein's report, Kemper denied Smith's LTD claim [AR 027-28].

Smith, through his attorneys, then appealed Kemper's denial to Bayer's ERISA Review Committee on October 23, 2003 [AR 003-4]. The appeal letter was accompanied by Dr. LeBuffe's outpatient progress notes covering the period from November 1, 2002, through September 16, 2003 [AR 005-10]. These materials also contained Dr. LeBuffe's assessment prepared on August 8, 2003 [AR 013-14]. All of these materials were then submitted by Kemper to Dr. Elana Mendelssohn, a clinical psychologist and neuropsychologist.

Dr. Mendelssohn completed her peer review on November 10, 2003 [AR 032-33]. Although Dr. Mendelssohn reviewed Dr. LeBuffe's medical records, she advises the reader to refer to Dr. Burstein's peer review "to obtain further detail of the previously reviewed documentation." [AR 033]. Dr. Mendelssohn pointed out that Smith reports experiencing emotional difficulties, but concluded that "the submitted documentation by Dr. LeBuffe do [sic] not provide objective examination findings or behavioral observations substantiating how the claimant's difficulties are impacting his functioning and preventing him from performing the core elements of his occupation." [*Id.*].

10

On November 19, 2003, Dr. Mendelssohn prepared an addendum to her report after reviewing notes from Norma Albanese, APRN [AR 034-35]. In that addendum, Dr. Mendelssohn concluded that "the submitted documentation fails to describe a severity and intensity of psychiatric symptoms in objective mental status terms to preclude work." [*Id.*].

The ERISA Review Committee, through a peer review organization, then requested an independent review of the file by a qualified physician [*see* Doc. 22, Ex. A, ¶8]. On December 12, 2003, Dr. Paul Orr, a board-certified psychiatrist and neurologist, completed a record review of Smith's claim file, including the opinions of the previous file reviewers [AR 037-39]. Dr. Orr noted that both Dr. Burstein and Dr. Mendelssohn could not support cognitive impairments preventing Smith from performing his regular occupation [AR 037]. Dr. Orr further noted that Dr. LeBuffe had opined that Smith was "[c]urrently unable to work [and] unable to work in sales." [AR 038]. Dr. Orr also observed that, despite Smith's reported panic problems, Smith was able to attend a real estate course and even obtain his license [AR 039]. Although Smith was hospitalized for depression in 2002 and was under the regular care of a psychiatrist from that point forward, Dr. Orr notes that there had been no mention of any psychiatric difficulties prior to Smith's leaving Bayer in January 2003. [AR 037 and 39]. Dr. Orr was of the opinion, therefore, that Smith was not disabled

11

from performing his job in sales or any position for which he could be trained [AR 039].[13]

On January 15, 2004, the ERISA Review Committee denied Smith's appeal, concluding that the record did not support a finding that he was unable to perform the essential duties of his regular job [AR 001-2]. As previously noted, Smith filed this action on March 18, 2004 [*see* Doc. 1].

During the course of this litigation, the parties became aware of some procedural irregularities and agreed to remand the claim for further review [*see* Docs. 15 and 16]. Also, during the pendency of this litigation, Smith relocated to Missouri where he was treated by Dr. Robert McCool, a board-certified psychiatrist, for his mental health issues. During this time, Smith began working as a laborer at a Target store, making considerably less money than he earned with Bayer [AR 179]. Specifically, beginning on May 5, 2004, Smith began earning wages of

---

[13]As noted, the peer reviews by Drs. Burstein, Mendelssohn, and Orr were ordered by Kemper. Bayer also ordered, sometime in early April 2003, a peer-to-peer review from a Dr. Verin. Although Dr. Verin's notes are not included in the record, a summary of his notes is referenced therein [AR 024]. In that summary, Dr. Verin indicated on the one hand that he contacted Dr. LeBuffe and that Dr. LeBuffe opined that Smith was disabled; yet, on the other hand, according to that summary, Dr. LeBuffe did not dispute Dr. Verin's assertion that he was not disabled [*id.*]. In spite of these contradictory statements, Dr. Verin recommended that Bayer should not approve Smith's benefits [*id.*].

12

$1,083.33 per month, which represents approximately 22% of his pre-disability earnings [AR 162].

In his sworn statement submitted on remand, Dr. McCool offered the opinion that Smith would have "a lot of difficulty being able to sustain the level of work that he had previously done in the type of sales position that he was accustomed to working in the past." [AR 202]. Dr. McCool also testified that while Smith is "somewhat stable" at his current job, he is still "struggling at the level of employment that he is working and he has had some difficulties at times." [AR 201]. According to Dr. McCool, Smith is able to maintain his current level of employment because "the work requirements are somewhat limited" and because this job does not require initiative or impose pressure on Smith [*id.*]. Dr. McCool also expressed doubts as to whether Smith would be able to maintain even this level of employment over the long term [AR 203-04].

Dr. McCool's treatment notes accompanied his sworn statement [AR 213-24]. According to these notes, Smith reported suicidal thoughts, depressed mood, and lack of motivation and concentration [*id.*]. Although Smith reported "feeling pressured at work" [AR 221], he actually received an Employee of the Month award which was "encouraging to him." [AR 219].

13

Also during the remand, Smith submitted a sworn statement from his previous treating psychiatrist, Dr. LeBuffe [AR 225-39]. In that statement, Dr. LeBuffe indicated that his assessment of Smith's limitations on his medical opinion form in August 2003 was based on his personal observations [AR 229-30]. Additionally, Dr. LeBuffe pointed out that when he first saw Smith during his hospitalization, Smith was "totally unable to function on his own at that time." [AR 230]. Dr. LeBuffe further explained that Smith exhibited symptoms of his panic disorder during the time in which he treated him [AR 230].

Moreover, upon inquiry by counsel regarding the so-called lack of objective findings relied on by the doctors for Kemper, Dr. LeBuffe testified as follows:

> Well, I assume that they meant that there were no observable symptoms at that time, but like with most of our patients, we largely rely on patients' report of symptoms. It is also the nature of panic disorder that the symptoms occur in discrete attacks which last sometimes very briefly but leave a dread and an inability to face certain situations that persist in between attacks.
>
> So when you see a person in the office, they may be relatively calm but still have that condition and still may be quite disabling [sic].

[AR 231].

Finally, Dr. LeBuffe elaborated on comments he had made to Dr. Burstein which had been interpreted by Burstein as meaning that Smith was only hindered in his return to work only by his fear of having a panic attack. Dr. LeBuffe testified that Dr. Burstein's recapitulation of their conversation was inaccurate, explaining that panic in anticipation of certain events and avoidance of those events are characteristic of panic disorders [AR 234]. Dr. LeBuffe also testified that Smith's panic and mood disorders were not caused by his employment with Bayer; rather, they were present before he ever began that position [AR 235-36]. Dr. LeBuffe again opined that Smith was "disabled" during the entire time while Dr. LeBuffe treated him [AR 237].

The record also contains a report by vocational expert Mark Boatner, M.Ed., CRC, LPC, dated January 17, 2005 [AR 164-80]. To prepare that report, Mr. Boatner reviewed the sworn statements of Dr. LeBuffe and Dr. McCool, as well as the assessment of mental limitations completed by Dr. LeBuffe on August 8, 2003, a psychiatric evaluation dated May 27, 2004, and treatment notes through November 23, 2004 [AR 164]. In his report, Mr. Boatner noted, among other things, that Smith's former employment as a pharmaceutical representative was "highly demanding, stressful and requires focus, attention, concentration, poise, and other high level attributes of a person." [AR 179]. In contrast, he noted that Smith's current job as a store laborer at Target is one which is "'unskilled'" [*id.*]. Mr. Boatner

15

then defined "unskilled" as work in which the "worker does not have great control over tasks and merely follows orders, takes instructions and generally does what he is told." [*Id.*]. Mr. Boatner then concluded his report as follows:

> For whatever reason, Mr. Terry Smith was overcome with major depression and a diagnosis of Bi-Polar II Disorder. He has obtained professional help and has made progress. However, it seems unlikely that he would accept this lower level of remuneration unless he did not have any other choice. I believe he is to be praised for his effort to regain productivity. I am sure that if and when he achieves a greater level of mental health he would seek work more appropriate with his earlier and higher level of responsibility and wage. However, I am not aware of any reliable method to predict his rate of recovery. I do believe that if he remains labile as indicated by the treatment notes of Dr. McCool that he is probably working at the highest possible level of which he is capable at this time. He probably needs more highly structured work assignments and greater physical demands tha[n] more control over tasks and lighter physical demands. I would state that the present level of employment is more therapeutic for him as an adjunct to the therapy provided by Dr. McCool. Likewise, as indicated by the statements of the treating psychiatrists and by my professional experience with job placement of individuals with major depression, he would likely do poorly if placed in a job that made more demands upon his resources. He is most likely "doing the best that he can". His situation is exemplary of why it is difficult for psychiatrists to rate mental impairment with a numerical percentage that might translate into a "disability rating." Unless he achieves a higher level of mental/emotional functioning, he is probably earning about as much money as could reasonably be expected of him. He might improve his position in the future or he might not be able. There does not seem to be enough information about his status to be more definitive than that.

16

I have based my conclusions on a reasonable degree of
vocational rehabilitation certainty.

[AR 180].

The ERISA Review Committee again obtained an independent medical

evaluation of Smith's claim.  On March 29, 2005, Dr. Stuart S. Burstein,[14] a board-

certified psychiatrist, issued a report based upon his review of the record, including

the materials provided with the January 18, 2005, letter [AR 273-77].  Dr. Burstein

noted that Smith's records "indicate that he has gone through episodes of Major

Depression and Panic Disorder [and that] it has been opined that he has Bi-polar

Disorder II and Attention Deficit Disorder."  [AR 275].  Nevertheless, Dr. Burstein

concluded as follows:

There is no indication of [Smith's] experiencing a degree of
psychiatric illness that would interfere with his functioning
satisfactorily as a pharmaceutical sales representative for
Bayer Corporation.  There likewise is no indication that he
lacks the mental ability to work at any job for which he is or
could become qualified by education, training, or
experience.

---

[14]It is worth emphasizing that, contrary to plaintiff's insistence [*see* Doc. 24, p.22],
this is a different Dr. Burstein from the one who completed a peer-to-peer review on May
9, 2003 [AR 030-31].  There is no way to determine, however, if these two doctors are
related.

[AR 276]. Dr. Burstein then supports that conclusion by pointing out that Smith "completed a real estate agent's program, passed the certification exam, handled the difficulties of a divorce and the challenges of remarriage, relocated, and found other work for himself." [*Id.*].

On April 29, 2005, the ERISA Review Committee issued a determination reaffirming its original decision to deny Smith's claim [AR 281-84]. The determination letter noted the disagreement between the conclusions reached by Drs. LeBuffe and McCool, on the one hand, and the two independent medical reviewers, Drs. Orr and Burstein, on the other hand [AR 282]. The Committee also advised Smith that it accepted the conclusions of the independent reviewers for a number of reasons, which are itemized in the determination letter [AR 283-84]. The Committee further determined that partial disability benefits are not applicable in Smith's situation but are intended for situations in which an employee returns to work for Bayer in a reduced capacity because of a partially disabling condition [AR 284].

By letter dated June 29, 2005, Smith, through his attorney, requested reconsideration of the denial of his claim [AR 286-87]. The letter also submitted a report from Dr. McCool and updated progress notes [AR 289-304]. Dr. McCool stated that he had reviewed the ERISA Review Committee letter, as well as the report of Dr. Burstein [AR 289]. Dr. McCool then opined that, while Smith is not

totally disabled, he would not be able to handle the stressors that would be involved with a pharmaceutical sales job [*id.*].  However, Dr. McCool did not address the issue of whether Smith was capable of handling other types of employment for which he was qualified [*id.*].

These additional materials were again submitted to Dr. (Stuart) Burstein, who provided the committee with a report dated July 15, 2005 [AR 306-08].  In that report, Dr. Burstein responded specifically to Dr. McCool's letter, which indicated that Smith could not handle the stressors of being a pharmaceutical sales representative.  Dr. Burstein opined as follows:

> I opine differently [from Dr. McCool], and I do so in part out of recognition for Mr. Smith's not only handling the routine duties of his job as a Salesperson at Target, but also handling the stressors of a reminder of his previous positions, a change in his personnel director, and a temporary assignment to work at night.  Those stressors challenged Mr. Smith, as he might be challenged in a job as a Pharmaceutical Sales Representative.  He has demonstrated a capacity to handle such challenges.

[AR 308].  Thus, Dr. Burstein again concluded that, even considering these most recent submissions, Smith was fully able to function as a pharmaceutical sales representative [AR 308].

Finally, in a letter dated August 10, 2005, the ERISA Review Committee informed Smith that its denial of disability benefits would be reaffirmed, explaining fully its reason for doing so [AR 278-80]. The Committee noted that, even had Smith qualified for disability benefits before he returned to work on May 5, 2004, his acceptance of that employment would, in any event, have terminated his eligibility for further benefits under a provision of the Plan that benefits terminate when a participant "'return(s) to employment at any job or become(s) self employed, regardless of whether or not you are compensated, other than an approved rehabilitation program.'" [AR 279]. This case was subsequently reopened by order dated November 3, 2005 [*see* Doc. 18].

II.

*Standard of Review*

This action seeking a review of the denial of plaintiff's benefits is governed by ERISA, 29 U.S.C. § 1132(a)(1)(B), which provides as follows:

> A civil action may be brought by a participant or beneficiary
> to recover benefits due to him under the terms of his Plan,
> to enforce his rights under the terms of the Plan, or to
> clarify his rights to further benefits under the terms of the
> Plan.

20

In *Wilkins v. Baptist Health Care Systems*, 150 F.3d 609, 617-20 (6th Cir. 1998), the Sixth Circuit established guidelines under which district courts must adjudicate ERISA cases brought before them for judicial review. The Sixth Circuit explained that using summary judgment as a tool for the adjudication of ERISA cases does not properly comport with the purpose of summary judgment. *Id.* at 619. Because the role of a district court in ERISA matters is not to determine whether issues of fact exist for trial, but to review the administrative record before it, district courts should more properly characterize their role in such proceedings as encompassing elements of both bench trials and summary judgments. *Id.* at 619-20. Following these guidelines, the district court proceeds by making adjudications on both fact and law as would occur in a bench trial while handling the matter in an expedited fashion resembling summary judgment. *Id.*

Furthermore, *Wilkins*, following Supreme Court precedent, dictates this court's standard of review in ERISA matters. Under *Wilkins*, this court has two possible standards of review. If the trustees of an employee benefit plan do not have discretion to determine eligibility for benefits or construe the terms of the Plan, this court is required to undertake a *de novo* review of the administrator's decision. *Id.* at 613. However, where a benefits plan vests discretion with the administrators, this court may only disturb the administrator's decision if it finds the basis of such a decision to be arbitrary and capricious. *Id.* at 616 (citing *Firestone Tire & Rubber*

21

*Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Regardless of the standard of review applied to the administrator's decision, "in an ERISA claim contesting a denial of benefits, the district court is strictly limited to a consideration of the information actually considered by the administrator." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 522 (6th Cir. 1998) (citing *Perry v. Simplicity Eng'g,* 900 F.2d 963, 966 (6th Cir. 1990)).

Here, the Plan states in pertinent part as follows:

> The Company shall have the exclusive right to make any finding of fact necessary or appropriate for any purpose under the Plans including, but not limited to, the determination of the eligibility for and the amount of any benefit payable under the Plans. The Company shall have the exclusive discretionary right to interpret the terms and provisions of the Plans and to determine any and all questions arising under the Plans or in connection with the administration thereof, including, without limitation, the right to remedy or resolve possible ambiguities, inconsistencies, or omissions, by general rule or particular decision.

[AR 060].[15] Based on this unambiguous language, the parties are in agreement that the appropriate standard of judicial review in this case is the arbitrary and capricious standard [*see* Doc. 23, p.10 and Doc. 25, p.3]. The court agrees.

---

[15] *See also* AR 099 ("The company, through the plan administrator, reserves the exclusive right to determine if you are totally or partially disabled. The company's decisions will be final, subject to the appeals procedures.").

Therefore, the issue now before this court is whether the plan administrator's decision to deny Smith his LTD benefits constitutes an arbitrary and capricious act based upon the administrative record. This standard "'is the least demanding form of judicial review of administrative action ... . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious.'" *Killian* at 520 (quoting *Perry v. United Food & Commercial Workers Dist. Unions 405 and 442*, 64 F.3d 238, 241 (6th Cir. 1995)). A decision will be upheld "'if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence.'" *Id.* (quoting *Baker v. United Mine Workers of America Health and Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).

Even though the arbitrary and capricious standard is deferential, "'it is not, however, without some teeth.'" *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (quoting *Cozzie v. Metro Life Ins. Co.*, 140 F.3d 1104, 1107-08 (7th Cir. 1998)). "[M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may

23

vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber-stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). The court's obligation under ERISA to review the administrative record to determine whether the plan administrator acted arbitrarily and capriciously "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald*, 347 F.3d at 172.

The Sixth Circuit has also recognized that a conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits. *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 299 (6th Cir. 2005); *see Killian*, 152 F.3d at 521 (observing "there is an actual, readily apparent conflict ... , not a mere potential for one" where a company both funds and administers an LTD policy, because "it incurs a direct expense as a result of the allowance of benefits and it benefits directly from the denial or discontinuation of benefits"). In such a case, because defendant maintains such a dual role, "the potential for self-interested decision-making is evident." *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n.4 (6th Cir. 2000). Nevertheless, this conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that the court must consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious. *Kalish v. Liberty Mut./ Liberty*

*Life Assurance Co. of Boston*, 419 F.3d 501, 506 (6th Cir. 2005).  Thus, this court must determine if there is evidence that the conflict in any way influenced the plan administrator's decision.  *Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 606 n.2 (6th Cir. 2004).

## III.

### *Analysis*

A.  *Conflict of Interest.*

As previously noted, even under an arbitrary and capricious standard, the court must consider any conflict of interest in its calculus.  "In considering such a conflict, there must be significant evidence in the record that the insurer was motivated by self-interest, and the plaintiff bears the burden to show that a significant conflict was present."  *Smith v. Continental Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006).  In the court's view, plaintiff has not developed any significant evidence in this record to show that any arguable conflict of interest contributed to an arbitrary and capricious determination by Bayer.

For example, the record reflects that LTD benefits are not paid directly by Bayer, but rather through a VEBA trust funded both by Bayer and employee contributions.  This funding mechanism has been held to minimize a potential conflict of interest.  *Vitale v. Latrobe Area Hosp.*, 420 F.3d 278, 282-83 (3rd Cir. 2005).

25

Additionally, Bayer employs the services of an outside firm to evaluate and make the initial determination of LTD claims. The intervention of a neutral decision-maker is another factor which tends to minimize the likelihood of a financial conflict affecting the outcome. *Stratton v. E.I. DuPont de Nemours & Co.*, 363 F.3d 250, 255 (3rd Cir. 2004) ("Although the case-by-case decision making, which as [plaintiff] points out means that each claimed dollar avoided is a dollar that accrues to DuPont, may leave room for some bias, the fact that DuPont structured the program by using Aetna to hear the claim initially provides the safeguard of neutral evaluation."). Finally, the physicians who provided the ERISA Review Committee with opinions as to Smith's claim were not selected by Bayer or the Committee. Rather, they were chosen by an outside firm. This is another key factor identified by courts as mitigating a conflict of interest. *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 234 (4th Cir. 1997) (use of independent medical consulting group "greatly mitigated" conflict); *Best v. Nissan Motor Corp.*, 973 F. Supp. 770, 778 (M.D. Tenn. 1997) ("The weight given to such conflicts is diminished when the insurer/fiduciary relies on truly independent medical consultants in making its decision.") (citation omitted).

For these reasons, the court concludes that Smith has not developed the record to demonstrate that any arguable conflict of interest contributed to an arbitrary and capricious determination by Bayer. This, of course, is not an end to the

ultimate inquiry as to whether the Plan's denial of Smith's LTD claim was arbitrary and capricious.

B. *Smith's LTD Claim.*

A key component of Smith's argument in support of his position that the Plan administrator's LTD decision was arbitrary and capricious is that the Plan relied on non-examining doctors in support of its position, despite the fact that Smith's two treating psychiatrists reached an opposite conclusion. The Sixth Circuit has observed that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). However, it must be emphasized that the Sixth Circuit reversed the district court's order in *Calvert* affirming the Plan's denial of benefits and remanded for entry of an order requiring the Plan to award benefits plus interest from the date on which the benefit payments ceased. In reaching that conclusion, the Sixth Circuit further observed as follows:

> Thus, while we find that Liberty's reliance on a file review does not, standing alone, require the conclusion that Liberty acted improperly, we find that the failure to conduct a physical examination - especially where the right to do so was specifically reserved in the Plan - may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.

27

[*Id.* at 295]. Likewise, this court is convinced that all of these file reviews were inadequate and that the Plan should have ordered at least one - if not several - examinations of Smith under the unusual circumstances of this case before reaching its decision.

Initially, the court notes that this Plan, like the one in *Calvert*, allows the Plan to order a psychiatric examination. Specifically, the Plan provides: "You may also be asked to submit to examinations by a doctor ... designated by the claims administrator." [AR 101]. In fact, the Plan provides that benefits will stop automatically if "you refuse to be examined by a doctor selected by the claims administrator[.]" [AR 100].

Rather than utilizing this provision of the Plan, Kemper, the third-party claims administrator, first directed Dr. Lawrence Burstein to conduct a peer-to-peer review by discussing the matter with Dr. LeBuffe. It must be emphasized that Dr. Burstein did not review any medical records; rather, he considered the occupational demands of Smith's job with Bayer, as well as the statement completed by Dr. LeBuffe. Dr. Burstein also had a telephone conversation with Dr. LeBuffe on May 9, 2003, stating that Dr. LeBuffe "indicated that Mr. Smith believes that he will have a panic attack if he returns to work." [AR 031]. Furthermore, according to Dr. Burstein, "Dr. LeBuffe acknowledged that Mr. Smith does not display significant

28

symptoms and, aside from Mr. Smith's belief, there are no barriers to his returning to work." [*Id.*]. Nevertheless, the record now contains Dr. LeBuffe's sworn statement that Dr. Burstein's recapitulation of their conversation was inaccurate, explaining that panic in anticipation of certain events and avoidance of those events are characteristic of panic disorders [AR 234]. Thus, any reliance by the Plan upon Dr. Burstein's earlier report is now totally misplaced. This is especially true because Dr. Burstein neither examined Smith in person nor reviewed any of his medical records.

The inadequate review continued. The next doctor hired by Kemper to review these records was Dr. Mendelssohn, a clinical psychologist and neuro-psychologist. Although Dr. Mendelssohn indicates that she has reviewed Dr. LeBuffe's medical records, she advises the reader to refer to Dr. Burstein's review "to obtain further detail of the previously reviewed documentation." [AR 033]. A review of Dr. Mendelssohn's report indicates that she has selectively highlighted all of the positive portions of Dr. LeBuffe's reports from April 9, 2003, through September 16, 2003, *i.e.*, "[Smith] reported feeling 'pretty much ok,.'" and has systematically ignored most of the negative portions. For example, Dr. Mendelssohn makes no mention whatsoever of Dr. LeBuffe's diagnosis that Smith suffered from, among other things, ADD. Similarly, Dr. Mendelssohn makes no mention of Dr. LeBuffe's diagnosis of Bipolar Disorder II (in addition to ADD) in his September 2003

report; rather, she states that Smith "reported that he was doing better [and that] Dr. LeBuffe described the claimant as calm and euthymic." [*Id.*]. Furthermore, the court does not attach much significance to statements by Dr. LeBuffe that Smith is "doing ok" or by Smith himself that he is "feeling 'pretty much ok'" because those statements must be kept in the context of Dr. LeBuffe's full treatment of Smith. Again, Dr. LeBuffe began treating Smith following Smith's release from the hospital for in-patient treatment of depression. At that time, according to Dr. LeBuffe, Smith was "*totally* unable to function on his own ... ." [AR 230 (emphasis added)]. From that perspective, any comment by Dr. LeBuffe to the effect that Smith was "doing ok" or was "feeling ok" may have signified nothing more than Smith did not need hospitalization or was simply able to function on his own. The point of all of this is that the reviewing doctors did not analyze these isolated statements in Dr. LeBuffe's report in the context of Smith's overall treatment as did Dr. LeBuffe. Thus, the court attaches little, if any significance, to these doctors' sparse analyses of these statements.

Even more significantly, when Dr. Mendelssohn discusses Dr. LeBuffe's August 8, 2003, questionnaire regarding Smith's limitations, she states:

> Dr. LeBuffe indicated impairments in the areas of communication, concentration, adaptability, interacting with the public. She also indicated impairments in the claimant's ability to relate to co-workers working at a

30

consistent pace. She reported findings of major depressive
disorder, and recurrent panic disorder.

[*Id.*]. Dr. Mendelssohn's recapitulation of Dr. LeBuffe's questionnaire is misleading

at best and an outright distortion at worst. That questionnaire clearly indicated that

Dr. LeBuffe rated Smith as "poor" in those areas, *i.e.*, Smith's "[a]bility in this area

is usually precluded." [AR 249]. In the court's view, there is considerable distinction

between an "impairment" in that area, as defined by Dr. Mendelssohn, as opposed

to one's ability being "usually precluded," as defined by Dr. LeBuffe. Quite

obviously, an individual who is "usually precluded" in those areas could not function

at the high level required by Bayer in its own analysis of the pharmaceutical sales

position occupied by Smith [AR 018]. Simply put, Dr. Mendelssohn's conclusion that

the "information submitted does not support the claimant's disability, from a

psychological perspective, from his own occupation as of 4/12/03 through the

present" is not rationally based upon all of the information available to her in Dr.

LeBuffe's records.


Additionally, Dr. Mendelssohn's addendum to her report a few days later

contributes very little to support the Plan's rejection of Smith's claim for LTD benefits.

In that addendum, Dr. Mendelssohn re-enforces her earlier conclusion based on

notes from a registered nurse [AR 035]. Neither the notes of the registered nurse,

nor Dr. Mendelssohn's analysis of those notes, provide a basis for disregarding the opinions of two treating psychiatrists.

The next physician to review this case on behalf of the ERISA Review Committee was Dr. Orr, a psychiatrist and neurologist. Again, the court is not impressed with Dr. Orr's report. Rather than fully analyzing Dr. LeBuffe's reports, Dr. Orr places undue emphasis on the peer reviews undertaken by Drs. Burstein and Mendelssohn. Moreover, Dr. Orr's comments over-emphasize the fact that Smith was able to attend a real estate course and obtain his license and "appears interested in pursuing a career in Real Estate Sales," and then leaps to the conclusion or "belief" that Smith's "choice of Real Estate Sales indicates that [Smith] can and wishes to pursue a career dealing with contact with sales prospects and requiring the sales ability he appears to possess." [AR 039]. Dr. Orr's analysis, as it turns out, is flawed because, as the record indicates, Smith was unable to pursue any career in real estate because of his well-documented psychiatric problems. In short, Dr. Orr's analysis is not persuasive because he has not fully analyzed Dr. LeBuffe's data, which he summarily rejects.

It is also for many of these same reasons that the court attaches little significance to Dr. (Stuart) Burstein's evaluation of Smith's claim. As previously stated, Dr. Burstein is cognizant of the fact that Smith's records "indicate that he has

32

gone through episodes of Major Depression and Panic Disorder [and that] it has

been opined that he has Bi-Polar Disorder II and Attention Deficit Disorder." [AR

275]. However, rather than fully addressing the data on which these diagnoses have

been made, Dr. Burstein reaches the following conclusion:

> There is no indication of [Smith's] experiencing a degree of
> psychiatric illness that would interfere with his functioning
> satisfactorily as a pharmaceutical sales representative for
> Bayer Corporation. There likewise is no indication that he
> lacks the mental ability to work at any job for which he is or
> could become qualified by education, training, or
> experience.

[AR 276]. Dr. Burstein then supports that conclusion by pointing out that Smith

"completed a real estate agent's program, passed the certification exam, handled the

difficulties of a divorce and the challenges of remarriage, relocated, and found other

work for himself." [*Id.*]. The court agrees fully with plaintiff's counsel that tasks such

as one's ability to "divorce and remarry, relocate and find a job ... are irrelevant to

whether or not Mr. Smith can persist at an occupation." [*See* Doc. 25, p.20].

Furthermore, the fact that Smith completed a real estate agent's program and

passed the certification exam has no bearing as to whether Smith can function at the

high level required by Bayer in his position as a Diabetes Sales Specialist. And, as

it turns out, Smith's ability to complete that real estate program and pass the

certification exam are of little comfort to him since he is unable to utilize those skills

to make a living because of his documented psychiatric impairments.

33

The court concludes that the above file reviews do not outweigh the opinions of plaintiff's two treating psychiatrists, Dr. LeBuffe and Dr. McCool. These two psychiatrists have treated Smith for long periods of time and for that reason the court attaches great weight to their opinions. Furthermore, their opinions are also supported by the opinion of vocational expert Mark Boatner. In reaching this conclusion, the court finds the following analysis by the district court in New York extremely persuasive:

> Courts routinely discount or entirely disregard the opinions of psychiatrists who had not examined the individual in question at all or for only a limited time. *See, e.g., People v. Espinoza*, 95 Cal. App. 4th 1287, 1116 Cal. Rptr. 2d 700, 718-19 (2002) (in a prosecution for molestation of a child, "L," where defendant "proposed to introduce testimony by a psychiatrist *who had never examined L* that L did not suffer from any mental illnesses diagnosed by any of the psychiatrists *who actually examined her*," appellate court affirmed trial court's ruling that the proffered evidence was speculative and therefore had little probative value") (emphasis added); *Campbell v. United States*, 307 F.2d 597, 598 (D.C. Cir. 1962) ("Appellant says, and we agree, that the testimony of the psychiatrist relied upon by the Government was of little probative value. The psychiatrist had no information about the defendant's mental condition, testified largely in terms of a legal conclusion, and *had never seen defendant prior to the trial.*" (emphasis added); *Rollerson v. United States*, 343 F.2d 269, 270 (D.C. Cir. 1964) ("[We] think it necessary to point out that the value of a psychiatrist's testimony depends largely upon *his opportunities for observation* [and] *the facts he observes.*") (emphasis added); *Jones v. United States*, 327 F.2d 867, 879-80 (D.C. Cir. 1963) ("Here the psychiatric evaluation apparently took but a few seconds and was limited to

34

observing the patient during that time through prison bars"; report of psychiatric panel that defendant was mentally competent based on so limited an observation "would not, in any event, be a predicate for any such adjudication") (concurring opinion).

69.    Courts discount the opinions of psychiatrists who have never seen the patient for obvious reasons. Unlike cardiologists or orthopedics, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms ... when a psychiatrist evaluates a patient's mental condition, "a lot of this depends on interviewing the patient and spending time with the patient," ... a methodology essential to understanding and treating the fears, anxieties, depression, and other subjective symptoms the patient describes.

*Sheehan v. Metropolitan Life Ins. Co.*, 368 F. Supp. 2d 228, 254-55 (S.D.N.Y. 2005).

It is for these same reasons that the court attaches so little significance to the cursory reviews of the four physicians hired by Kemper or the ERISA Review Committee. Not one of these psychiatrists spent any time with Smith. The most telling observation in this entire record is Dr. Burstein's review on July 15, 2005, in which he responds specifically to Dr. McCool's letter indicating that Smith could not handle the stressors of being a pharmaceutical sales representative. Again, Dr. Burstein opined as follows:

I opine differently [from Dr. McCool], and I do so in part out of recognition for Mr. Smith's not only handling the routine duties of his job as a Salesperson at Target, but also

35

handling the stressors of a reminder of his previous positions, a change in his personnel director, and a temporary assignment to work at night. Those stressors challenged Mr. Smith, as he might be challenged in a job as a Pharmaceutical Sales Representative. He has demonstrated a capacity to handle such challenges.

[AR 308]. As previously noted, Bayer's own analysis of its pharmaceutical sales position shows that the job requires high levels of functioning in several areas, including the abilities to communicate, influence others, and make decisions. In other words, Bayer's position is a skilled position which requires the employee to operate at a high level. Smith, however, is currently employed as a store laborer - his position does not even qualify as a sales person. This unskilled position does not require interaction with people other than to receive instructions from a supervisor. That job requires lower levels of reasoning, language, and mathematical skills than Smith's prior occupation. For Dr. Burstein to suggest that Smith is currently employed as a sales person as opposed to a stock handler is another distortion in this record. For Dr. Burstein to then suggest that Smith's present employment as a stock handler supports his conclusion that Smith is able to handle his previous job as a pharmaceutical sales representative borders on the absurd. At a minimum, his conclusion is arbitrary and capricious. Thus, for all of these reasons, the court finds that the Plan's decision to deny Smith his LTD benefits is likewise arbitrary and capricious.

C.  *Smith's Partial Disability Claim.*

Finally, Smith claims that he is entitled to partial disability benefits beginning on May 5, 2004, the date he began working for Target as a stocking person / laborer. [AR 161-62]. The ERISA Committee rejected this claim in its April 29, 2005 letter because it determined that Smith was not disabled from performing his pharmaceutical sales job and also because the partial disability provisions are intended to apply to Bayer employees who are able to return to work in a part-time rehabilitative capacity for Bayer - not to former employees who are working full-time elsewhere and earning a lower salary. [AR 284].

The summary Plan description provision provides in pertinent part as follows:

> The LTD Plan also provides benefits if you are partially disabled or participate in a rehabilitation program where you work part-time while you recover from your disability. ... The rehabilitation program may provide physical therapy or retraining, or it may be a period of part-time work at your old job or a new position. Your rehabilitation program, whether formal or informal, must be approved in writing by the company medical representative and the claims administrator before it can be considered rehabilitative.

[AR 099]. Furthermore, the summary Plan description provides that, "[b]enefits will stop automatically if you ... [r]eturn to employment at any job or become self-employed, regardless of whether you are compensated, other than a claims

administrator-approved rehabilitation program for which you are qualified by reason of your education, training or experience." [AR 100]. Based on these two provisions, the ERISA Review Committee determined that Smith's claim for partial disability benefits must be rejected because this is only "a benefit which may be available for Bayer employees who return to work in a part-time capacity, but not to former employees who are working full-time elsewhere and earning a lower salary." [AR 284]. It is undisputed that Smith's job at Target was never approved as a rehabilitation assignment; in fact, Smith never requested that it be so approved.

Where a claimant's failure to comply with the requirements of a Plan is the direct result of the administrator's arbitrary and capricious denial of benefits, the claimant has no continuing responsibility to comply with the terms of the Plan. *Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 24-25 (1st Cir. 2003). In *Cook*, the Plan imposed a continuing obligation on the claimant to furnish proof of her disability. *Id.* at 24. After the court awarded benefits, the plan administrator argued that there was no evidence of plaintiff's disability after the close of the administrative record. *Id.* Nevertheless, the First Circuit Court of Appeals found that it would be "patently unfair" to insist that a claimant comply with the Plan requirements during the course of her internal appeals and litigation on the "off chance that she might prevail in her lawsuit." *Id.* at 25.

Here, as in *Cook*, Smith's benefits had been terminated at the time he attempted to earn some income by working at Target. By that point in time, the Plan had already determined that Smith was entitled to no benefits under the Plan; consequently, it would have been futile for Smith to ask the Plan to approve a rehabilitation plan under these circumstances. This court, persuaded by the rationale of *Cook*, finds that it would have been likewise "patently unfair" for Smith to have requested that the Plan approve his job at Target as some sort of rehabilitation assignment. The court thus finds that Smith's failure to do so will not preclude his ability to recover partial disability benefits. Again, in his current position, Smith makes 22% of his earnings at Bayer, well below the "comparable wage" threshold noted in the Plan [AR 099 ("For most purposes, a comparable wage would be considered as 70% or higher of your pre-disability earnings.")]. Plaintiff's vocational expert, Mark Boatner, has testified that Smith is unlikely to earn much more than his current wages until his condition improves. The record demonstrates that Smith is not capable of earning a wage comparable to that which he earned at Bayer so that he is entitled to these benefits.

## IV.

### *Conclusion*

In over two decades on the federal bench, this court has rarely awarded a plaintiff ERISA benefits when the court is required to consider a Plan's denial of those benefits under the deferential arbitrary and capricious standard. It is indeed an onerous burden for a plaintiff. Nevertheless, after a careful review of the administrative record in this case, the court is constrained to conclude that this is indeed one of those rare cases. In short, as detailed above, the court concludes that the reviewing doctors "cherry-picked" certain parts of Smith's medical records to support their positions and, in the process, ignored other key portions of the record which indicated that Smith was truly disabled. It is also particularly troublesome that the two doctors who actually examined Smith found him disabled, and those who never bothered to do so found otherwise. Under these circumstances, the Plan's rejection of Smith's LTD claim was arbitrary and capricious and an award of those benefits is in order.

Enter judgment accordingly.

_____*s/  James H. Jarvis*_____
UNITED STATES DISTRICT JUDGE